# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-478V

|  |  |
|---|---|
| ARMANDO CIRELLO,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Chief Special Master Corcoran<br><br>Filed: January 30, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Eleanor Hanson, U.S. Department of Justice, Washington, DC, for Respondent.*

### <u>DECISION AWARDING DAMAGES</u>[1]

On April 6, 2023, Armando Cirello filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he experienced Guillain Barré syndrome ("GBS") as the result of receiving an influenza ("flu") vaccine on January 17, 2022. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although Respondent conceded entitlement, the parties could not informally resolve damages on their own, so I ordered briefing on the matter.

For the reasons set forth below, I find that Petitioner is entitled to compensation in the amount of $165,000.00, for actual pain and suffering, $5,979.19 in past lost wages, and $6,176.24 in out-of-pocket medical expenses, for a total of **$177,155.43**.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.    **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global

2

comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.    The Parties' Arguments

The parties agree Petitioner should be awarded $6,176.24 for past unreimbursed expenses. *See* Br. at 1, n.1; Resp. at 1, n.1. Thus, the only areas of disagreement are the amounts of compensation which should be awarded for actual pain and suffering and past lost wages. Petitioner seeks $185,000.00 for past pain and suffering, and $85,000.00 in lost wages. Br. at 1. Respondent proposes a lesser award: $89,000.00 for pain and suffering, and $5,979.19 in lost wages. Resp. at 1, 16.

In arguing for a significant pain and suffering award, Petitioner argues that his medical records show a debilitating, "severe[,] and continuous injury that precipitated an extended course of treatment that has never fully restored [him] to the state of health he enjoyed prior to his January 17, 2022 flu vaccination." Br. at 8. He describes his injury course as a "grueling, long-term ordeal," because his injury and course of treatment has persisted for approximately 29 months, "with no foreseeable end in sight." *Id.* at 9, 11. He suspects his injury may be permanent and extend for the "rest of his life," as he continues to suffer from upper back pain, fatigue, numbness, and balance issues that make it difficult for him to climb stairs and work in precision metal manufacturing. *Id.* at 11-12.

Petitioner favorably compares the duration and severity of his hospital stay and medical treatment – consisting of a 16-day hospitalization at three different facilities, diagnostic procedures (including an MRI, CT scan, EMG, lumbar puncture, and five-day course of plasmapheresis), difficulties ambulating and with balance (requiring the aid of a walker), and both in-patient and out-patient rehabilitation – with those experienced by the petitioners in *McCray, Johnson,* and *Fedewa,*[3] all featuring past pain and suffering awards of $180,000.00. Br. at 8-14. He insists that his injury and treatment course warrant a greater award in past pain and suffering than the petitioners in his cited cases. *Id.* at 14.

---

[3] *McCray v. Sec'y of Health & Hum. Servs*., No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000.000 for past pain and suffering); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for past pain and suffering); *Fedewa v. Sec'y of Health & Hum. Servs.,* No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) (awarding $180,000.00 for past pain and suffering).

With respect to lost wages, Petitioner asserts that his GBS has severely impacted his business income, derived from ownership and operation of a precision metal shop. Br. at 14. Petitioner contends that as a result of his hospitalization, he was unable to work "for an extended period of time," and when he returned weeks later, he required a walker. *Id.* Because of the fatigue, pain, and the instability caused by his GBS, he "still cannot work the number of hours he did prior to his vaccine injury[;]" which limits his ability to meet deadlines. *See id.*; *see also* Ex. 16 ¶ 6. He thus works at a slower pace or requires assistance to complete tasks.[4] Ex. 16 ¶ 6. As a result, this "negatively impacts the profitability of [his] business." Br. at 14-15 (citing Ex. 17). Accordingly, Petitioner has had difficulty paying back business loans. *See id.* at 15; *see also* Ex. 16 ¶ 6.

Respondent, by contrast, emphasizes evidence showing Petitioner had a mild-to-moderate course of GBS that required an 11-day hospital stay, four days of inpatient rehabilitation, five rounds of plasmapheresis, and resulted in a "few longer-standing sequela" requiring assistance with ambulation and activities of daily living ("ADLs"). Resp. at 9. However, Respondent contends that after being discharged from inpatient rehabilitation, Petitioner ultimately "made a complete recovery" within approximately five months and has had "consistently unremarkable" neurologic exams since 2022 – with the only evidence to the contrary coming from Petitioner, but unsupported by objective findings. *Id.* at 10, 13.

As guidance, Respondent cites two other decisions featuring pain and suffering awards of $92,500.00 and $95,000.00, respectively - *Granville* and *Geschwindner.*[5] Resp. at 11-12. Respondent also contends that Petitioner's clinical course was less severe than the petitioners in the cases he relied upon for support. *Id.* at 12-13.

In regard to past lost wages, Respondent highlights that Petitioner's requested sum is based on a calculation of the difference in "sales revenue" from his business post-vaccination versus before his injury, and "vague[ly]" refers to his loss of a business loan. Resp. at 15 (citing Br. at 14-15). But Respondent deems this calculation to be "speculative at best."[6] *Id.* More so, the Act does not "contemplate compensating *lost sales revenue*; it

---

[4] Specifically, Petitioner describes difficulties with carrying objects and climbing ladders/stairs and equipment. Ex. 16 ¶ 2. He also notes that he cannot work a full day as a result of his fatigue and pain in his feet. *Id.* ¶ 4.

[5] *Granville v. Sec'y of Health & Hum. Servs.,* No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). Although Petitioner provides a Westlaw cite of 2022 WL 177372 for *Geschwindner*, that January 28, 2022 decision was withdrawn in response to the granting of Petitioner's request for post-judgment relief. *See Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2022 WL 22942770 (Fed. Cl. Spec. Mstr.  Oct. 11, 2022).

[6] Respondent stresses that Petitioner has not consulted with an economist in arriving at a calculation for past lost wages and his Exhibit 17 "contains a series of primary source documents that do not delineate [P]etitioner's proposed calculation of lost earnings or an offset for applicable taxes." Resp. at 16.

permits compensating *lost earnings,*" and revenue and earnings are "distinct measurements." *Id.* (citing Section 15(a)(3)(A); Merriam-Webster's Online Dictionary, defining "Earnings" and "Revenue") (emphasis in original). As such, Respondent contends Petitioner cannot demonstrate his lost wages from that time are $85,000.00.

Petitioner replies that as a result of his GBS, he experienced a loss of actual and anticipated earnings as a small business owner. Reply at 6. Specifically, he was unable to operate his business for an extended period of time, and, when he was able to return, his instability reduced his productivity. *Id.* Petitioner maintains that "there is no logical rationale for concluding that a loss of business revenue is in any way different from a loss of any other type of job-related earnings." *Id.* He thus seeks the difference in his sales revenues between years 2022 and 2023 ($253,513.96 - $169,466.96 = $85,000.00). *Id.*

### III.    Appropriate Compensation for Petitioner's Past Pain and Suffering

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact his consciousness of his injury. Therefore, I analyze principally the severity and duration of the injury. When performing this analysis, I review the record as a whole, including the medical records and declarations filed, and all assertions made by the parties in written documents.

Petitioner's medical records and declarations provide a credible description of his GBS injury, which featured a moderately-severe acute phase requiring admission to the hospital within roughly one-and-a-half months of vaccination (on March 2, 2022).[7] At this time, Petitioner had a few weeks' history of a cough, myalgias, and fever, and his lower extremity weakness was so severe he could not stand on his own (and had soiled himself because he was unable to get to the bathroom); he also had slurred speech, blurred vision, abdominal and lower back pain – requiring the use of a walker for ambulation. *See,* e.g., Ex. 4 at 55, 76.

Following admission, Petitioner's ongoing symptoms resulted in a twelve-day hospitalization (through March 14, 2022); treatment at increasingly higher-level facilities (including the intensive care unit); diagnostic procedures including MRIs, CT, lumbar puncture (and later an EMG); five rounds of plasmapheresis, prescription medications (including azithromycin and ceftriaxone for treatment of a concurrent bronchitis infection); modified diet of thin solids and liquids; discharge to four days of in-patient rehabilitation

---

Respondent further notes that he has independently consulted with a broker in arriving at his proposed amount for past lost wages, $5,979.19. *Id.* at 16, n.4.

[7] Prior to this date, Petitioner went to the emergency room on several occasions (for a cough, headache, vomiting) but was not admitted, including on February 26 and 28, 2022. Ex. 7 at 3, 34. Petitioner also had a telehealth visit on February 22, 2022. Ex. 9 at 5.

(with physical and occupational therapies ("PT"/"OT"); and continued assistance with ADLs and ambulating[8] at the time of discharge to outpatient PT[9] on March 18, 2022. *See,* e.g., Ex. 4 at 15, 31, 55, 66; Ex. 6 at 41, 57; Ex. 12 at 60, 85.

As of result of this hospitalization (and his preceding symptoms prior to hospitalization), Petitioner had to "close [his] business" (a precision metal manufacturing shop) thus costing him "personal and business income" during this time. Ex. 13 ¶ 2. This also caused Petitioner stress and anxiety about his ability to repay loans, and he ultimately deferred/was in forbearance on unidentified loans. *See id.* ¶ 5, 8-9; *see also* Ex. 16 ¶ 6. Within "[a] few weeks" of his in-patient discharge, he returned to work "to a very limited extent and could only be there for a few hours at a time[;]" he sat in a chair, used a walker, and directed work to his employees in order to keep his business open. Ex. 13 ¶ 7.

Petitioner reported improvement after his initial treatment course. He was able to ambulate by himself, albeit with a cane, by the time of his first out-patient neurology visit on March 31, 2022 (approximately two weeks post in-patient discharge). Ex. 4 at 4. Specifically, at the time of Petitioner's March 31, 2022 neurology visit, he reported "his walking is improving, vision is improving as well . . . numbness and tingling in fingers and feet [] has improved . . . dysphagia, slurred speech and abdominal cramps . . . had resolved." *See id.* The treater opined Petitioner's GBS was "slowly improving[;]" but that Petitioner had ongoing GBS-related symptoms at this time, including with coordination, balance, weakness, and fatigue. *Id.* at 4-5.

By mid-July 2022, when Petitioner sought the opinion of a second neurologist, his condition continued to improve, and his strength and reflexes were normal upon examination. Ex. 10 at 5-6. Indeed, on July 14, 2022, Petitioner's treating neurologist opined that his GBS "appears essentially resolved" – aside from some "mild decreased sensation in the feet" and some weakness, which was felt could be due to a lack of endurance. *See id.* Still, Petitioner continued to attend regular neurology follow-up visits – including with a third and later fourth neurologist – throughout 2022 and into early 2023 for treatment of residual effects of his GBS (i.e., back pain, numbness and tingling in his feet, balance issues, and weakness). Ex. 10 at 9-13, 15-17; Ex. 11 at 4-6; Ex. 14 at 1-2.

Although I credit Petitioner's assertions that he *currently* continues to experience some ongoing sequelae of his GBS (including numbness, pain, fatigue, and balance issues (e.g., Ex. 13 ¶ 9; Ex. 16 ¶ 2)), his GBS recovery has been good overall – a fact

---

[8] Specifically, Petitioner required "minimal" assistance with ADLs; one person assistance with ambulation; and overall assistance with bathing, dressing, toileting, and transferring from bed to chair. Ex. 6 at 41.

[9] No records from any of Petitioner's treatment with out-patient PT have been filed for consideration.

supported by his medical records. *See,* e.g., Ex. 10 at 5-6 (discussed above); *see also* Ex. 11 at 4-6; Ex. 14 at 1-3 (another neurologist opining on February 15 and March 27, 2023, that Petitioner's GBS was "stable[;]" he was "recovering well" with no ongoing or additional treatment recommended to manage his symptoms; examination consistent with normal gait and coordination, strength, reflexes, and sensation). Indeed, on June 27, 2023, though Petitioner's issues with "imbalance and thoracic pain [were] still present," they had "much improved" and Petitioner "[d]eclined new medicines" to treat these ongoing symptoms. Ex. 14 at 5-6. Additional imaging was also deferred "given [the] improvement" and the plan was to monitor Petitioner's progression. *Id.* at 7-8.

Thereafter, Petitioner did not return to care for six months (on January 31, 2024). While he still had noted balance issues and back pain "present AFTER GBS," the conditions were "much improved" and again Petitioner declined medications.[10] Ex. 15 at 1 (emphasis in original). It is notable that Petitioner did not attend any additional medical visits after this date - and interestingly, he attended this, and several other neurology follow ups, well into the pendency of the present action (with the Petition having been filed on April 6, 2023). I therefore will not rely heavily on this stand-alone January 2024 visit in assessing the duration of Petitioner's injury. I thus find the record overall supports the conclusion that Petitioner's vaccine-related GBS was ongoing through approximately June 2023 (or for approximately 16 months post onset)[11] – though with some mild lingering effects of balance issues, fatigue, and back pain.

Based upon the forgoing, and considering the parties' written arguments, I find that Petitioner suffered a moderate GBS injury – although as a class GBS injuries are distinguishable in severity from many other kinds of common Program vaccine injuries. GBS constitutes a particularly frightening type of vaccine injury – and as a result, a higher-than-average pain and suffering award is usually appropriate. *See Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

At the same time, however, the considerations that always impact determination of a proper pain and suffering award – level of pain, length of hospitalization and inpatient rehabilitation, degree and number of procedures for treatment, duration of treatment, and overall recovery – bear herein on what Petitioner should receive. Some GBS injuries feature permanent disabilities, while others are characterized by a better recovery. Here,

---

[10] I give *some* weight to Petitioner's contention that this decline of medications could have been (at least partially) due to a concern regarding the side effects of certain medications. Ex. 16 ¶ 3.

[11] The onset of Petitioner's GBS supported in the contemporaneous medical records (and agreed upon by Respondent) was around 24 days post vaccination, or around approximately February 10, 2022. *See,* e.g., Resp. at 3; Ex. 4 at 76. Petitioner immaterially alleges a different onset date – around February 25, 2022. Br. at 9.

Petitioner's GBS injury required moderate acute medical treatment, including one 16-day hospitalization/inpatient treatment; it impacted his ability to run his own business or maintain the same level of work for an extended period of time; and he required the use of a walker and/or cane to assist with ambulation (and ADLs) for some time following his acute phase. However, his subsequent condition is much improved, even accounting for some lingering deficits common to GBS's aftermath (balance issues, fatigue, pain). Thus, Petitioner's overall treatment course has therefore been moderate compared to many. And, Petitioner's case is not as severe as the worst GBS cases, wherein injured parties often remain non-ambulatory or significantly disabled.

Turning to the parties' cited comparable cases, Respondent's citations are somewhat unhelpful, since they do not set forth all that well when a sub-six figures pain and suffering award would be appropriate in the context of a GBS injury. Petitioner certainly ought to be awarded more than in *Granville*. No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). That petitioner experienced a mild acute phase (and GBS injury overall), including a five-day hospitalization, no in-patient care, and very little out-patient care – followed by a "quick and full recovery," with admittedly no lingering sequelae. *See id.* Here, Mr. Cirello's course included substantially more care in the acute phase, with persistent and lingering residual effects. These distinguishing factors alone entitle Petitioner to a larger sum than $92,500.00, as awarded in *Granville*. Likewise, the $95,000.00 awarded in *Geschwindner* is comparably insufficient, as that petitioner was hospitalized for a shorter duration (three total days versus Petitioner's 16), received no inpatient rehabilitation, and did not undergo infusions (including with IVIG or plasmapheresis) or an LP – thus speaking to a significantly milder injury than Petitioner's here. No. 17-1558V, 2022 WL 22942770 (Fed. Cl. Spec. Mstr. Oct. 11, 2022). Petitioner is thus entitled to a higher award than that proposed by Respondent.

Petitioner's comparables are better, but still involve damages awards slightly higher than what is warranted here, as the injured parties in those cases (where pain and suffering awards were $180,000.00), experienced worse acute phases of their injuries, had extended treatment, or had prognoses requiring ongoing medication. *See,* e.g., *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Fedewa v. Sec'y of Health & Hum. Servs.,* No. 17-1808V, 2020 WL 1915138, at *6 (Fed. Cl. Spec. Mstr. Mar. 26, 2020). Indeed, in Program cases where more than $175,000.00 is awarded, the injured parties tend to have experienced ongoing and obviously severe residual symptoms, and not just the kind of sequelae common in the aftermath of GBS. And many petitioners have faced permanent limitations on the nature of the work they could perform. I recognize that Petitioner has some long-lasting sequelae from his GBS that impacted his work to some degree (including with productivity), but they do not appear to be as severe as those cases cited by Petitioner. In fact, Petitioner's neurologist specifically stated that Petitioner's GBS was "essentially

resolved" and that he was "recovering well." *See,* e.g., Ex. 10 at 5-6; Ex. 11 at 4-6; Ex. 14 at 1-3.

The *McCray* petitioner, for example, was hospitalized for 12 days (akin to Petitioner here) but subsequently underwent a 21-day inpatient stay, thus considerably longer than Petitioner's four-day inpatient stay, and had at least one month of outpatient care, including with rehabilitative therapy. *See* 2021 WL 4618549. Both the petitioner in *McCray* and Mr. Cirello required assistance with ambulation and/or balance following their discharge from inpatient care (including the use of a cane), and they each experienced a general, slow improvement over time. *See id.* However, the *McCray* petitioner's residual sequelae documented in the medical records (i.e., fatigue, pain, and balance issues) extended for more than four years post onset, and she never returned to her baseline or regained complete independence with ADLs. *Id.* In fact, the *McCray* petitioner was unable to return to her part-time job, she could not participate in activities she once enjoyed, and she required ongoing use of medications (including an inhaler to treat the asthma she developed from her GBS) and a cane for ambulation as a result of her ongoing symptomology. *Id.* Petitioner is thus entitled to a lesser award.

The remaining two cases cited by Petitioner (*Fedewa* and *Johnson*) were decided by another special master and outside of the SPU context. I accordingly give these cases slightly less weight in assessing damages in this situation (since SPU has been attempting for more than five years to systematize awards, in order to ensure better overall conformity) but will nevertheless discuss some distinguishing features. The *Fedewa* petitioner, as here, experienced a somewhat lengthy stay in the hospital and/or inpatient rehabilitation, but had a disease course that was more severe and involved significantly more treatment, along with long-term medications to manage symptoms. *See* 2020 WL 1915138. And although both the petitioner in *Fedewa* and Mr. Cirello experienced disruptions to their employment as a result of their injuries, Petitioner returned to work within a few weeks of his onset and acute phase, whereas the *Fedewa* petitioner could not return to work (or drive) for over three months – and when that individual did, he required ongoing weightlifting restrictions as prescribed by his treaters. *Id.* While I credit that Petitioner has ongoing limitations as a result of his injury, including challenges running his own precision metal shop, he is deserving of a slightly lesser award.

Similarly, the *Johnson* petitioner's acute course included IVIG, *in-home* PT, and over 45 personal training sessions; compounded by the difficulties in travel associated with the petitioner's rural geographic location. *See* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018). The *Johnson* petitioner's residual effects included fatigue, numbness, and incontinence, to the point that she required always keeping a spare change of clothes with her out of fear of not knowing when she required use of the

bathroom. *See id.* The *Johnson* claimant was forced to modify her role from a bus driver to a librarian (with modified/lesser duties) as a result of her ongoing GBS sequelae. *Id.* While Petitioner also experiences ongoing disruptions or alterations to his standard practices in his precision metal shop, he has not shown by a preponderance that he has had to abandon his prior line of work or significantly change the way he conducts or completes his business (other than slowing down his productivity/requiring additional assistance), sufficient to justify this high of a pain and suffering award. Still, such factors will be taken into account in determining a proper award in this case.

Although Petitioner enjoyed a greater and fairly complete recovery following his approximate 16-month course compared to some of the petitioners in the cases he relies upon for support, he continues to suffer from some long-term, lingering effects of his GBS (including balance issues, pain, and fatigue). Petitioner has demonstrated that as a result of these symptoms, he has to work slower and/or requires assistance to complete work tasks and jobs that he would have usually done himself (as this work requires coordination, lifting, and climbing stairs and ladders) – thus limiting his work productivity and profitability. Still, he continues to run his own business, performing some tasks himself.

Petitioners in the Program who have also undergone similar real-life injury impacts have received higher pain and suffering awards. *See,* e.g., *Gruba v. Sec'y of Health & Hum. Servs.,* No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021) (awarding $165,000.00 in a moderate GBS case involving a petitioner who left a job at a childcare facility because she was unable to handle the physical demands of her position as a result of her residual numbness, and she could no longer receive future vaccinations as a result of her GBS). Petitioner's decreased hours and change in work productivity caused by his physical limitations speak to his pain and suffering and thus are separate and apart from his lost wages. *See,* e.g., *Johnson,* 2018 WL 5024012 (noting that the petitioner's inability to work and her change in work hours as a result of her GBS symptoms are distinct issues that are separate and apart from her request for lost wages). I find that Petitioner's alteration in work practices, including working at a slower pace, and the overall uncertainty surrounding his business and his ability to repay loans as a direct result of his injury thus warrants a larger pain and suffering award in this case.

For these reasons, although I do not find that the GBS injury and its sequelae were of such high severity to justify an award of the magnitude requested by Petitioner, the actual pain and suffering component will nonetheless be higher than in many vaccine injury cases, simply for the reason that the severe and frightening quality of an immune-mediated injury like GBS warrants commensurate damages. I therefore award actual pain and suffering of **$165,000.00.**

10

## IV.     Appropriate Compensation for Petitioner's Past Lost Wages

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner" in accordance with generally recognized principles and projections." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with some evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2021 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope, as such calculations were rooted in speculation rather than generally recognized actuarial evidence and projections required by the Act).

As the parties correctly identify, the term "earnings" is not defined within the Vaccine Act. *See* Resp. at 14-15; *see also* Reply at 5-6. Interpretation of Section 15(a)(3)(A) for loss of earnings among adults has begun with the premise that earnings are indeed "[r]evenue gained from labor or services, from the investment of capital, or from assets." *Eilan v. Sec'y of Health & Hum. Servs.,* No. 15-381V, 2024 WL 4222583, at *6 (Fed. Cl. Spec. Mstr. Aug. 15, 2024); *Heinzelman v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 808, 816 (2011) (quoting BLACK'S LAW DICTIONARY 548 (9th ed. 2009)), *aff'd*, 681 F.3d 1374 (Fed. Cir. 2012).

Special masters have considered this issue in various forms and have arrived at differing conclusions concerning what meets the definition of "earnings" under the Act. *See,* e.g., *Bryan v. Sec'y of Health & Hum. Servs.*, No. 14-898V, 2024 WL 3797739, at *16 (Fed. Cl. Spec. Mstr. July 15, 2024) (concluding that Social Security retirement income is a form of "earnings" for purposes of a loss of earnings claim under the Vaccine

Act, explaining that "Social Security retirement income is paid to members during retirement years based on their work history, contributions, and retirement age. It is revenue gained from labor. Further, it is subject to federal income tax, depending on the income level of the recipient."); *But see Watkins v. Sec'y of Health & Hum. Servs*., No. 95-154V, 1999 WL 199057, at *3 (Fed Cl. Spec. Mstr. Mar. 12, 1999) (expressing doubt that the term "weekly earnings," as used in Section 15(a)(3)(B), includes Social Security); *see also Gross v. Sec' of Health & Hum. Servs*., 154 Fed. Cl. 109 112 (2021) (finding it was not an abuse of discretion for the special master to conclude that use of a paid time off ("PTO"), identified as an employment benefit, constituted a loss of earnings under the statute even though the evidence did not "definitively show that petitioner's unused PTO would be paid out"). As the prior caselaw demonstrates, what constitutes a "loss of earnings" in the Program varies but is largely limited to what can be quantified, without speculation.

Petitioner requests $85,000.00 in past lost wages, relying on the calculation between the difference in sales revenue from years 2022 to 2023. Br. at 14-15; Reply at 6. In support, Petitioner submitted evidence of his tax documents and returns dating back to 2017. *See generally* Ex. 17. While I credit Petitioner's argument that the Act surely does not intend to penalize small business owners by barring them from obtaining the same compensation to which non-business owners are entitled (Reply at 6), I am unable to find that lost sales revenue can be deemed equivalent to *lost wages*, without a better, objectively-supported showing that they are.

In general, special masters have noted that the purpose of an award of lost earnings is to provide the claimant with income lost *as a result of* a vaccine injury. *Sarver v. Sec'y of Health & Hum. Servs*., No. 07-307V, 2009 WL 8589740, at *10 (Fed. Cl. Spec. Mstr. Nov. 16, 2009) ("The lost wage component replaces the income that the injured party would have earned and then used to support himself (or herself)."). Petitioner here was out of work for a defined period. While Mr. Cirello has shown that he earned less in sales *revenue* between 2022 and 2023 (e.g., Ex. 17), he has not offered sufficient objective proof that would corroborate his contention that the decrease in revenue was a direct result of Petitioner's vaccine-related injury, all other things being equal. It is speculation to assume Petitioner would have earned the same in sales revenue from year to year, and/or that but for his injury his revenue would have been higher. There are in fact endless reasonable explanations for a less profitable year.[12] Accordingly, Petitioner's revenue calculation is too speculative in nature to embrace.

Respondent's calculation of the sum of lost wages ($5,979.19) is plainly better-supported. *See* Resp. at 16, n.4. The amount proffered by Respondent is not based on

---

[12] Petitioner noted, for example, that his business had not fully recovered after the COVID-19 Pandemic - and the vaccination at issue occurred in this subsequent timeframe. Ex. 13 ¶ 8.

speculation of what Petitioner *hoped* he would have made under optimal conditions during that time frame had he not suffered from vaccine-related GBS, but rather is based on the earnings Petitioner *actually lost* during the time he was out of work as a direct result of his hospitalization and injury. Petitioner is thus entitled to past lost wages in the amount of **$5,979.19.**

## CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $177,155.43**, **(representing compensation for actual pain and suffering, past lost wages, and out-of-pocket expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.